IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 9, 2005 Session

## STATE OF TENNESSEE v. CLAUDE FRANCIS GARRETT

**Appeal from the Criminal Court for Davidson County**
**No. 92-B-961      Seth Norman, Judge**

_____

**No. M2004-02089-CCA-R3-CD - Filed December 1, 2005**

_____

The defendant, Claude Francis Garrett, appeals his Davidson County Criminal Court jury conviction of first degree felony murder, which resulted in a sentence of life imprisonment. On appeal, he claims that (1) the convicting evidence was insufficient; (2) three prosecution witnesses presented false testimony; (3) the trial court erred in admitting expert testimony; (4) the trial court erroneously instructed the jury on various points of law; (5) the trial court erred in failing to require a witness to answer defense counsel's questions on cross-examination; (6) the trial court erred in denying the defendant's motion for the payment of travel expenses for a non-resident witness; (7) the state withheld exculpatory evidence; and (8) he was denied due process of law. Following our review, we affirm the conviction.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the Appellant, Claude Francis Garrett.

Paul G. Summers, Attorney General & Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Jon Seaborg and Nancy Kim, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The conviction results from a charge that, in the early-morning hours of February 24, 1992, the defendant started a fire in the Davidson County home in which he and the 24-year-old victim, Lori Lance, were residing. After the firefighters' entry into the smoldering house, they found the victim lying prone in a utility room in the rear of the small house. The utility room door was closed, and the victim lay under an aluminum lawn chair and some toys. The victim died of smoke and gas inhalation.

The trial presently under review is the defendant's second trial on the charged offense. The first trial resulted in a first degree murder conviction that was vacated by this court on appeal in the defendant's post-conviction proceeding. *See Claude Francis Garrett v. State*, No. M1999-00786-CCA-R3-PC (Tenn. Crim. App., Nashville, Mar. 22, 2001) (vacating the conviction and ordering a new trial on the basis of the state's withholding of exculpatory information).

Prior to the second trial, the court held an evidentiary hearing upon the defendant's motion to dismiss the indictment. In his motion, the defendant claimed that the state had lost or destroyed physical evidence, including crime-scene photographs. In the hearing, a Tennessee Bureau of Investigation (TBI) forensic analyst testified that she analyzed material samples taken from the burned house by fire investigator Kenneth Porter, including soil from under the house, liquid from the driveway, wood from the floor inside the front door, and a ten-gallon plastic container outside the house. She also analyzed material samples submitted by Metro police detective David Miller. Her analysis was designed to determine the presence of any petroleum distillate in the samples.

Investigator Porter testified in the hearing that he took the samples of soil and of wood from the floor near the front door because he thought that the floor in that area of the house was the point of origin of the fire. He delivered his samples to, and retrieved them from, the TBI laboratory. Later, following the defendant's conviction in his first trial, Mr. Porter destroyed the samples.[1]

Regina Draper, an investigator with the district attorney general's office, testified in the hearing that, in August 1993, she checked out 38 crime-scene photograph negatives from the police property room, delivered them to an assistant district attorney general, and did not take them back to the police department. She testified that the negatives were not in the district attorney general's file and that she had no knowledge of their whereabouts.

Following the hearing, the trial court ruled that the presence of Mr. Porter's physical samples were unnecessary to assuring a fair trial because the defendant could rely upon laboratory analysis of the samples that showed that they contained no petroleum distillates. The trial court opined that the defendant failed to establish that the photograph negatives were not the negatives of photographs introduced into evidence in the defendant's first trial and that he, therefore, failed to show that they were unavailable.

Also, prior to the second trial, the court conducted a hearing upon the defendant's challenge of Agent James Cooper as an expert witness on the cause of the fatal fire in the present

---

[1]James Cooper, an agent of the Federal Bureau of Alcohol, Tobacco, and Firearms, testified in the hearing that the Metro police department asked him to assist them in the investigation of the fire that caused the victim's death. He collected some material samples from the floor beneath the baseboard of the front room in the house. We glean from the evidence presented at trial that Agent Cooper's collected samples were given to Detective Miller and that these samples were the ones delivered to the TBI laboratory by Detective Miller. Apparently, the Cooper/Miller samples yielded positive test results for petroleum distillates while the Porter samples yielded negative results. The Cooper/Miller samples were not destroyed and were presented as evidence in the trial now under review.

case.   In the hearing, Agent Cooper testified about his background and training as an arson investigator, and the trial court ruled that the witness was qualified to render his opinion on the origin of the fire.

The defendant's second trial began on July 21, 2003.  The victim's mother, Sandra Lee Jones,  testified that she was concerned about the victim's safety in the house that she occupied with the defendant because the house had no rear exit and was heated by a kerosene heater.  Ms. Jones explained that, years before the victim's death, she and her family had witnessed a fire in their neighborhood that had killed a child, and as a result, Ms. Jones had stressed fire safety to her family, including the victim.  She testified that the victim had installed a smoke alarm in the kitchen, and Ms. Jones noticed the alarm on the kitchen wall three days before the fire.  Ms. Jones testified that the victim had bought a fire extinguisher a week before the fire.  She testified that, when she went to the hospital following the fire, the defendant held up his bandaged hands to her, said he was burnt, and said nothing about the victim.  On cross-examination, Ms. Jones testified that she did not recall whether the victim had said anything about the defendant painting the kitchen, but Ms. Jones did recall seeing paint buckets in the kitchen three days before the fire.

Michael Alcorn testified that he lived across the street from the victim and the defendant.  On the morning of February 24, 1992, his wife woke him and told him that the house across the street was on fire.  Mr. Alcorn testified that he put on trousers and ran across the street. He testified, "I noticed Mr. Garrett stumped [sic] down by a tree when I first came out."  The defendant was 25 or 30 feet away from the burning house.  Mr. Alcorn testified that, when he crossed the street, the defendant jumped up, grabbed a lawn chair, started to break the windows on the side of the house, and hollered for the victim.  The defendant broke out each bedroom window and then began striking the plywood that covered the bathroom window with an axe.  The defendant then began spraying the front room with a garden hose.  Mr. Alcorn opined that the first fire truck arrived within five to ten minutes.  The firefighters extracted the victim from the house and placed her in an ambulance.

The defendant was in the Alcorn home when Mr. Alcorn returned from work at 5:30 or 6:00 p.m. on February 24, 1992.  Mr. Alcorn testified that his wife informed him that the victim had died.  The defendant spent the night in a car in the Alcorns' yard, and Mr. Alcorn saw him the next morning.  Mr. Alcorn testified that the defendant never mentioned the victim in Mr. Alcorn's presence.

On cross-examination, Mr. Alcorn disagreed that during and following the firefight the defendant was in a state of panic.  Although the defendant screamed "Lori" at each window, Mr. Alcorn opined that the defendant's emotional state was "so-so."  Mr. Alcorn agreed that the defendant had burns on his hand and that his facial hair was singed.  Mr. Alcorn had smelled alcohol on the defendant but could not say that the defendant was intoxicated.  Mr. Alcorn acknowledged that, in his prior statement, he did not mention the defendant's squatting beside the tree.

Bobby Alcorn, Michael Alcorn's son, testified that he was 17 years old at the time of the fire. At approximately 5:00 on the morning of February 24, 1992, he was preparing to go to school and heard his dog barking and a "kind of bang" that sounded "like a shotgun." Within a few minutes, he heard his mother screaming that the defendant's house was on fire. He looked across the street, saw the fire, and saw the defendant "kind of squatted down by a tree." Bobby Alcorn testified that when his father ran across the street, the defendant rose, took a lawn chair, and broke a window in the house. The defendant used an axe to attack the plywood covering on the bathroom window before giving the axe to Bobby Alcorn. Bobby Alcorn overheard the defendant telling Michael Alcorn that he did not believe the victim would have gone to the utility room.

Bobby Alcorn stayed home from school that day to be with his mother, who was distraught about the fire and the victim's death. During the day, he talked with the defendant and attributed the following statement to the defendant:

["]I know they think I done it,["] and he was referring to the police. And he said, ["]I know they think I done it. If I would have done it, I'd have to go around back and get a gasoline can, go to the car and syphon it out, and then I'd had to pour it around on the love seat, I mean on the couch and around the door facing and I would have had to light it.["]

Bobby Alcorn testified that during the day of February 24, the defendant never spoke of the victim; the defendant was "nervous" and "acted different." He testified that the defendant would peep out the windows of the Alcorn home and would retreat to the bathroom if someone turned into the driveway.

On cross-examination, Bobby Alcorn acknowledged that in his prior statement, he did not mention the defendant's squatting beside the tree.

The forensic pathologist who performed an autopsy on the victim testified that the victim died from inhaling smoke and noxious gases, probably succumbing within 10 to 30 minutes after she began to breathe smoke. The victim's blood alcohol level was .06 percent. The physician testified that the victim had burns on her head and left arm and that the burns probably resulted from heat build-up in the utility room where the victim was found. Other than the burns, the victim's body had suffered no other trauma. The physician opined that fire victims will frequently retreat to a room away from the fire and have been known to burrow under objects to protect themselves.

The doctor visited the crime scene and looked at a bar latch on the outside of the utility room door. She testified that the victim was five feet, six inches tall, weighed 135 pounds. She opined that had the victim been inside the utility room with the latch engaged, she should have been able to break through the latch from the inside of the utility room.

-4-

Otis Jenkins testified that he was a Metro fire department captain in 1992 and responded to the fire at the victim's and the defendant's house. He "came upon a door that had a locking mechanism of some sort on it, got the door open, [and] went inside." He recalled that the door "resisted" and that he had "to work it." He found the victim in the room behind the door; she was lying on the floor between the washing machine and the wall. On cross-examination, Mr. Jenkins testified that the door was "latched or locked. I don't recall exactly what." He did not recall telling Detective Miller that the door was not latched, maintaining that he had always believed that the door was latched when he discovered it. He testified that although he wore thick gloves, he worked the mechanism on the latch to open the door. Because the alarm on Mr. Jenkins' self-contained breathing unit sounded, he left it to other firefighters to remove the victim. Later, while outside, he saw the defendant try to enter the house before being escorted away by two firefighters.

Terry Nickens, another Metro fire department captain, testified that he arrived at the fire scene at 5:15 a.m. When he heard that a person remained inside the house, he accompanied firefighter Patrick Hunt on a search and rescue mission inside the house. When the victim was found inside the utility room, Mr. Nickens entered the room. The victim's legs were tangled in tricycles, toys, and other objects. Mr. Nickens and Mr. Hunt carried the victim out of the house at approximately 6:03 a.m. Mr. Nickens noticed that the defendant "[s]eemed rather calm for the situation at hand."

Patrick Hunt testified that he was a firefighter and an emergency medical technician in 1992 when he arrived at the fire scene, where he saw heavy smoke and flames coming from the front door. The defendant approached him and told him that his girlfriend was inside the house. The firefighters were able to "knock down" the fire quickly, and Mr. Hunt began searching for the victim. Before the victim was found, Mr. Hunt's breathing unit became depleted of air, and he returned to the fire truck for a new one. The defendant approached him again and said, "I know where she's at. She's in the back of the house through a door in the kitchen." Mr. Hunt re-entered the house, and he and Mr. Nickens went to the utility room door that Mr. Jenkins had just opened. The victim was lying prone on the floor under a folding chair and some toys. She had no life signs. He opined that he and Mr. Nickens removed the victim at about 5:42 a.m. He recalled that Mr. Jenkins had told him that Jenkins had to unlatch the utility room door. He acknowledged on cross-examination that it is not uncommon for someone being suffocated to retreat and burrow under objects.

Another Metro fire department captian, William McCormick, testified that he supervised the fire scene and did not enter the house. During the firefight and rescue operation, the defendant went to the front of the house and looked into the windows. Mr. McCormick and another firefighter escorted the defendant away from the house. The defendant told Mr. McCormick that the person inside the house was his sister. The defendant was agitated and smelled of alcohol, although his speech was not slurred, and he did not stagger. When the victim was placed in the ambulance, the defendant climbed onto the running board and tried to look inside the ambulance. Mr. McCormick agreed that Mr. Jenkins had told him that the utility room door was latched when he found it.

David Miller testified that he investigated the fire in his capacity as a Metro homicide detective. He and Detective Mike Roland arrived at the scene at 6:20 a.m. on February 24, 1992. After Kenneth Porter told him that the fire was started with an accelerant, Mr. Miller met with the defendant, obtained the defendant's clothing, and requested the defendant to render a hand-swab sample, which the defendant declined.

That evening, after obtaining a search warrant, Mr. Miller accompanied Agent James Cooper in recovering material samples from the burned house. He testified that in the kitchen, they found a bedspread on the floor, lying beneath the refrigerator and "all the way around out towards the [utility room] door." He testified that the bedspread appeared to be soaked in some kind of accelerant, that he could smell an accelerant, and that he found a plastic container nearly full of what appeared to be kerosene on the floor near the utility room door. He testified that Otis Jenkins had told him that the utility room door was latched. Mr. Miller testified that he tested the latch by going inside the utility room and being unable to push his way out through the door after Agent Cooper experimentally engaged the latch. Mr. Miller acknowledged, however, that he did not "put his shoulder into it." Mr. Miller found a smoke detector lying on either the washer or dryer in the utility room. The detector had neither a covering nor batteries. Mr. Miller testified that Mr. Cooper collected material samples and gave them to him, that he placed them inside airtight metal containers, and that later he delivered them to the TBI laboratory.

Mike Roland testified that, as a homicide detective, he assisted David Miller in investigating the victim's death. He initially interviewed members of the Alcorn family to "get a grasp" of the situation and learned from them that they had heard an explosion and had seen the defendant running around the house yelling and perhaps trying to get into the house. Mr. Miller then interviewed the defendant after the fire and recounted that the defendant said that in the evening before the fire, the defendant and the victim had been out drinking, they returned home, and fell asleep in the living room before retiring to the bedroom. Mr. Roland testified that the defendant told him that he had awakened, smelled smoke, yelled for the victim, and started out of the house. The defendant said that he noticed the victim heading for the kitchen. In a later interview, the defendant told Mr. Roland that he was leading the victim out of the bedroom by the hand when she jerked away and went toward the kitchen. Mr. Roland presented audiotapes and transcripts of the defendant's statements.

On cross-examination, Mr. Roland testified that the victim appeared to have been dressed for bed. He recalled that the defendant's hair was singed and that one hand was bandaged. After the fire, the defendant did not appear to be upset or intoxicated. Mr. Roland acknowledged that before the officers collected evidence on the evening of February 24, the fire department had cleaned the floor in the house with a booster hose. He remembered that water stood in the kitchen floor. When, in reference to a photograph, Mr. Roland was asked about a clean blue cigarette lighter that appeared out of place on the charred dresser in the bedroom, he agreed that someone must have left the lighter there after the fire and that its presence could signify contamination of the crime scene.

The TBI analyst who tested the material samples collected by Kenneth Porter and James Cooper testified that a section of the bedspread and the plastic container from the kitchen, the smoke detector, and living room debris collected from near the front door tested positively for the presence of a kerosene range distillate.[2]  The defendant's trousers and shirt contained no distillate.[3]

On cross-examination, the TBI analyst testified that she received from Kenneth Porter a soil sample taken from beneath the suspected point of fire origin in the front room floor, a piece of carpet taken from the same location on the front room floor, a ten-gallon plastic can found behind the house, and liquid collected from the driveway.  None of these samples contained any chemical distillates.  A sample of wood flooring taken by Mr. Porter from beneath the front door sill revealed the presence of terpenes, but the analyst explained that the presence of this chemical probably resulted from the use of wood preservative on the door or the wood floor.  The wood samples contained no kerosene range distillate.  The analyst acknowledged that kerosene range distillate presence on some of Mr. Miller's samples could have resulted from transference by handling by the officers.  She admitted that kerosene could have been present in some of the samples for an extended period of time.

James Cooper testified that he had retired as an agent of the United States Department of Treasury Bureau of Alcohol, Tobacco and Firearms (ATF).  As an ATF agent, he had been a certified fire investigator and a fire-cause and origin specialist.  Because local authorities had requested that he assist in investigating the fire that killed the victim, he inspected the house on the evening of February 24, after the fire department had washed the flooring with a booster hose.  He opined that the washing did not obstruct or hamper his observation of the burn pattern.  He concluded that the fire began in the front room.  He found no evidence of an electrical or other accidental cause of the fire. A kerosene heater found in the bedroom was not the cause of the fire.  He discovered a saturation of kerosene in the kitchen.  The utility room door was closed during the fire.  Mr. Cooper testified that Otis Jenkins told him that he had "had to use two hands to slide the bolt on the latch to the other side to open the door."

Mr. Cooper testified that he collected material from beneath the baseboard in the front room because liquid spilled in the floor would typically run under a baseboard and because the flooring beneath the baseboard was free of foot traffic occurring during and after the firefight.  Also, he found a "V" pattern on the baseboard, which to him was "like a red flag waving at you," indicating an accelerated fire.  Mr. Cooper presented a number of pictures and slides of the fire scene.  He opined, "[T]his was a deliberately set fire, arson.  Somebody went into the house, and their design, their intent, was to spread the fire from the front room to the back where the victim was."

---

[2]These items had been collected by Mr. Cooper and transported to the laboratory by David Miller.

[3]Apparently, these were the items collected by Mr. Roland, who assisted Mr. Miller in investigating the case.

Defense counsel engaged Mr. Cooper in a rigorous cross-examination, during which the witness testified that the kitchen floor contained "[q]uite a bit of water," that a portion of the liquid on the bedspread was water, and that he relied upon Detective Miller's report of his interviews of the firefighters and did not interview them personally other than to talk with Otis Jenkins. Mr. Cooper did not see the house before the booster-hose cleansing and did not see the front-room furniture in its pre-fire position. He insisted, however, that the flooring in the front room evinced a "pour pattern," indicating that a liquid accelerant had been poured in the floor. He admitted that polyester from furniture could melt onto the floor and simulate a pour pattern but maintained that he could distinguish a pour pattern from a polyester meltdown. He admitted that one photograph showed that the latch bar was dark, as if it was coated in carbon, which might indicate that the bar was not inserted into the latch housing during the fire.

Fire investigator Kenneth Porter testified for the defendant. He arrived on the scene of the fire at 6:30 a.m. on February 24, 1992. He determined that the point of origin was in the floor at the front door and that the fire was started via a liquid accelerant. He opined that the pour pattern covered 60 or 75 percent of the front room floor. The bedspread was not mentioned in Mr. Porter's report. He testified that a smell of kerosene in the house could have emanated from the kerosene heater. He collected samples of soil beneath, and carpet from, the front room floor at the suspected point of origin, and he collected a wood sample from under the front door sill. He submitted these samples to the TBI but destroyed them when he retired from the fire marshall's office. He testified that as a means of enhancing his investigation, he had the front room furniture, which had been removed during the firefight, returned to its pre-fire position in the front room. He testified that radiant heat can sometimes simulate a pour pattern on a wood floor.

Ruby Alcorn, the wife of Michael Alcorn, testified that she was awakened on the morning of the fire by a commotion outside "like someone hollering." She did not hear an explosion. She looked outside and saw flames emanating from the front door and window of the house across the street. The defendant was standing by a tree, jumping up and down and screaming, "Lori." Ms. Alcorn yelled for her husband, who got up, donned his trousers, and ran across the street. Her son, Bobby, followed his father. On cross-examination, she testified that the defendant stayed in the Alcorn home during the day of the fire. She attributed to him a statement very similar to that recounted by Bobby Alcorn that the defendant knew the police suspected him of arson, followed by his detailing what he would have had to have done to set the fire. She also agreed that during the day, whenever someone came to the Alcorn home, the defendant would go to the back of the house. At one point, he spent a long time in the bathroom, where he shaved his facial hair, leaving a mess for her to clean up. She opined, "He didn't worry about anybody but himself."

Metro police officer John Murphy testified that he was instructed to secure the fire scene and arrived at 9:30 a.m. on February 24. He was told to leave – and did leave – at 11:00 or 11:30 a.m. He did not recall whether other officers arrived to secure the scene.

Regina Draper Beene[4] testified that in her capacity as an investigator for the district attorney general's office, in August 1993, she obtained 38 negatives of pictures taken by Officer James Goodman. She delivered the negatives to an assistant district attorney general but never retrieved them. She testified that she attempted to locate them but was unable to do so. She agreed that some of the pictures offered into evidence in the defendant's first trial had been taken by James Goodman and could have been produced from any number of the 38 negatives.

James Goodman testified that as a Metro police officer he took photographs of the fire scene but never reviewed the photographs.

Betty Satterfield, the defendant's mother, testified that she lived in Kansas in 1992 and that when she learned that the defendant had been burned, she sent for him to come to her home. When he arrived, he had burns on his face and hands.

R.J. Corbin testified that as a firefighter, he arrived on the fire scene at 5:08 a.m. on February 24, 1992. Upon his arrival on the first truck to respond, the defendant hammered on the truck door and said there was a woman inside the house. Mr. Corbin testified that approximately 40 minutes after he arrived, he had to escort the defendant away from the front of the house.

Stewart Bayne testified for the defendant as an expert in fire investigation and fire science. He acknowledged that he did not visit the scene of the fire until after the house had been restored but maintained that he has testified in other cases despite being unable to personally inspect the fire scene. In the present case, he studied the records from the first trial, interviewed the firefighters, and examined the pictures. He testified:

> This fire was a Class A fueled with paper and plastic fabrics, accidental natural growing, meaning unaccelerated by a petroleum compound type fire. Secondly, analysis of the burn patterns on Ms. Lance and Mr. Garrett proved that Ms. Lance and Mr. Garrett were exposed to that fire at the same point in time with the fire . . . . Furthermore, there are burn patterns indicating a direction quality to the fire, and a height in the room to the fire. My findings included that this fire was not fueled by kerosene, the point of origin was not on the floor, rather it was in the love seat. And the ignition source was the carelessly dropped cigarette from an intoxicated, wasted as it were, person.

Mr. Bayne elaborated that based upon the medical reports, the victim and the defendant sustained burns on their faces and left arms as a result of being exposed to the flames in the living room at the same time. He opined that because the burns were on the upper portions of the victim and the defendant, the fire did not originate in the floor. He believed that the burns on the couple were

---

[4] By the time of trial, Ms. Draper had married and was identified as Regina Beene.

consistent with them trying to reach the front door and with the defendant's statement to him that, after a night of drinking, the couple returned home and smoked cigarettes, with the victim falling asleep on the love seat and the defendant falling asleep on the couch.

Mr. Bayne opined that the fuel load in the front room, including the furniture and the wood paneling covering the sheetrock walls, explained the fire growth. He opined that the defendant did not receive his burns from igniting kerosene and that it was "impossible" for the victim to have received her burns from inside the utility room. He dismissed the burn pattern on the front room floor as resulting from radiant heat or "flash over."

Mr. Bayne testified that the utility room door edge had scuff marks which indicated that the door stuck in the door frame. He testified that the defendant confirmed to him that the door tended to stick. Mr. Bayne opined that the latch bar was "very carbonized."

On cross-examination, Mr. Bayne testified that in reaching his conclusions, he ignored Otis Jenkins' claim that the utility room door had been latched. He declined to say how much time elapsed between the deposit of a lit cigarette in the love seat and the onset of a blaze, although he suggested that the process could take minutes or hours. He opined that the presence of the plastic container of kerosene in the kitchen was irrelevant to the cause of the fire. He conjectured that because the container had three holes in the top, the firefighters or investigators could have sloshed some of the kerosene onto the bedspread.

The defendant did not testify in the case.[5]

### I. Sufficiency of the Evidence

The defendant claims that the evidence is insufficient to support a conviction of felony murder because the state failed to prove all of the elements of arson, the felony upon which the felony murder conviction is based.

As an appellate court reviewing the sufficiency of the convicting evidence, we essentially view a different evidentiary mosaic than did the trier of fact. We see the same tesserae as did the trier of fact, but on appeal the full mosaic has been altered: Different hues emanate from the fact trier's inferences and credibility shadings, and from the appellate perspective of the overall image, we see in highlight the features most favorable to the state. *See State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978) (stating that on appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom). Our review of the evidentiary mosaic, thus highlighted, is aimed at determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. Crim. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 2782 (1979).

---

[5]The defendant underwent a *voir dire* examination by the trial judge and counsel that validated his decision not to testify.

A jury's verdict of guilty removes the presumption of innocence and raises a presumption of guilt on appeal. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The jury's guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all factual conflicts in favor of the theory of the state. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978); *State v. Townsend*, 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the defendant has the burden of overcoming the presumption of guilt. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

A crime may be established by direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 484, 470 S.W.2d at 613.

For purposes of the present case, felony murder is committed by one who kills another in the perpetration of, or attempt to perpetrate, any arson, Tenn. Code Ann. § 39-13-202(a)(2) (2003), and arson is committed by one who knowingly damages any structure by means of a fire or explosion "[w]ithout the consent of all parties who have a possessory, proprietary or security interest therein," *id.* § 39-14-301. The defendant posits that the state failed to establish that the house and its contents were damaged *without the consent* of all persons having a possessory or propriety interest therein.

We disagree. The evidence showed that the deceased victim resided with the defendant in the fire-damaged house. The evidence also revealed that the house contained household furnishings and other personalty. A photograph depicted smoke-damaged bedroom furniture where the victim and the defendant slept. All in all, the circumstantial evidence was sufficient to establish that the victim had at least a possessory interest in the house and furnishings.

We hold that the evidence also circumstantially supports a finding that the damage was caused without the victim's consent. One component of the evidence that circumstantially established that the defendant set the fire is that the defendant placed the victim in the utility room and latched the door from the outside before setting the fire. This component also serves to establish an absence of the victim's consent. We are confident there is no reasonable basis for theorizing that the victim consented to setting fire to a house in which she was trapped and doomed to die by inhaling noxious gases.

Accordingly, we conclude that the evidence sufficiently supports the jury's finding that the defendant committed felony murder based upon its finding that the victim's death resulted from the defendant's perpetration of arson.

## II. False Testimony

The defendant argues that the state sponsored false testimony from three witnesses, Bobby Alcorn, James Cooper, and David Miller. Specifically, the defendant alleges that each of these witnesses testified at the instant trial differently than they testified at his first trial and that the differences in the witnesses' testimonies were detrimental to him.

The state may not knowingly present false testimony and has an affirmative duty to correct the false testimony of its witnesses. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972); *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). The state's failure to correct false testimony of a witness violates due process of law as guaranteed by the United States and Tennessee constitutions. *Giglio*, 405 U.S. at 153-54, 92 S. Ct. at 766; *Spurlock*, 874 S.W.2d at 618. In order to obtain a new trial, the accused must establish that the prosecution knowingly presented false testimony that was material. *State v. Cureton*, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000). In determining the materiality of the testimony, the inquiry becomes whether a reasonable likelihood exists that the false testimony could have affected the jury's judgment. *See Giglio*, 405 U.S. at 154, 92 S. Ct. at 766.

### A. Bobby Alcorn

The defendant asserts that by comparing the following colloquies from the defendant's first and second trials, this court should conclude that Bobby Alcorn testified falsely at the defendant's second trial.

The following is an excerpt from Bobby Alcorn's direct examination testimony at the defendant's first trial:

> Q: Okay. What was the first thing you saw when you went out of your house?
>
> A: Fire was hovering around the door facing and the window facing, I mean, just like this right here, shwisssssssh.
>
> Q: And what was Mr. Garrett doing?
>
> A: Well, when I got there – I took off running across the road and my Dad was to the sidewalk, and he picked up something and busted out that window. And by the time my Dad got to that one he'd take off to the next one. My Dad busted out that window. I mean, he busted – [the defendant] busted out that window and then my Dad went over there and was trying to listen to see if he could hear anything, hear her hollering.

-12-

Q:      Let me back up just a minute.  What's the very first thing you saw Claude Garrett do when you came up on the scene?

A:      Well, he was at the window.  I seen him pick up something and he busted out the window.

Q:      Was it a lawn chair?

A:      Some type of chair.

Q:      He was picking it up?

A:      Yeah.

. . . .

Q:      Okay.  You seemed to be implying before that he broke the window out without listening to see if anybody was going to respond, or anything.  Was that what you were saying or not?

A:      No.  'Cause see, when my dad – when he – when I come out of the house and I seen that fire and I went back up into my room and got dressed, run across the street and by then he got – as I was getting across the street he was picking up a chair or something, I'm pretty sure it was a chair.

. . . .

Q:      Okay.  Let me back up just one more time.  You first looked out the window before you got dressed and you saw the house on fire? . . .  Did you see Mr. Garrett at that time?  Or just the house?

A.      I can't remember.

Q       Okay.

A:      All I remember is that house on fire.

Q:      Okay.  You told me that he was, when you got over there you said he was screaming and hollering and running around the house, breaking out windows, is that what you told me?

-13-

A:     No, I said he was busting out windows. . . .

The defendant also presents this portion of Bobby Alcorn's cross-examination testimony from the first trial for the court's consideration:

Q:     All right, well, did you see him standing out in the yard watching it burn?

A:     No.

Q:     The whole time you saw him he was running around trying to get in and put it out?

A:     No, he wasn't trying to get in.  He wasn't making no progress to get in.

Q:     He was just breaking out the windows?

A:     He was busted [sic] out the windows.

The defendant argues that the following excerpt of Bobby Alcorn's second trial testimony contains false testimony:

Q:     When you looked outside, when you first looked outside, what did you see?

A:     Just a fire really blazing out the front of the house.  And I seen [the defendant], he was kind of squatted down by a tree.

       . . . .

Q:     Now when you got outside the house, describe exactly again what you saw as far as what was going on across the street[.]

A:     The front door and the two front windows was just blazing, it was rolling up, the fire was just rolling up the front.  And right there by where it says chest or whatever, kind of diagonal of the house is where the tree was where I seen squatted down on side D.

Q:     So you're indicating on the left corner of side A.

-14-

A:  Yeah.

Q:  And so that's the side where you saw what?

A:  Where I seen [the defendant] squatted down.

Q:  And can you demonstrate for the jury, if you can step out of your witness box for a moment, and demonstrate how you saw him by the tree?

A:  (Whereupon witness complies.)

Q:  Okay.  Okay.  Thank you.  Did you eventually go to where [the defendant] was standing or squatting?

A:  He was standing by the time I got over there.

Q:  And did you seen him do anything else at that point?

A:  I seen my dad, when my dad got over there, when my dad got about to the sidewalk and he got up and grabbed the chair, a lounge chair I think it was, and busted out a window.

The defendant asserts that Bobby Alcorn's first and second trial testimonies conflict because Bobby Alcorn testified at the first trial that the defendant was breaking windows and yelling for the victim when he first saw him but testified at the second trial that the defendant was "squatted down" by a tree while his house was burning when he first saw the defendant.  The defendant further asserts that the state knew or should have known that it was soliciting false testimony from Bobby Alcorn.  The state counters that Bobby Alcorn's testimonies are not contradictory and that the alleged inconsistency is the result of the witness's response to two different questions.  Specifically, the state asserts that at the defendant's first trial, when asked, "What was the first thing you saw Claude Garrett do when you came upon the scene?", Mr. Alcorn responded that the defendant was "at the window," breaking it.  At the second trial, Mr. Alcorn clarified that while he was still at his house before he crossed the street to the defendant's house, he looked across the street and saw the defendant squatting by a tree.   We agree with the state that the difference in the two testimonies is primarily attributable to the defendant's responses to different questions.  We recognize, however, that in the first trial, Bobby Alcorn testified that when he first viewed the defendant's house from inside his house, he reported seeing the house on fire but did not refer to seeing the defendant squatting by a tree.  We conclude that this discrepancy may represent more of a shift in emphasis than an actual contradiction, and at any rate, there is no indication that the second trial testimony was false or that the state presented testimony that it knew to be false.

-15-

B.  James Cooper

Next, the defendant complains that James Cooper, who was a special agent with the Bureau of Alcohol, Tobacco, and Firearms (ATF) and who investigated the instant crime,[6] testified falsely at his second trial that he interviewed a firefighter about whether the door to the utility room where the victim was found was latched when the firefighters entered the house.  The defendant presents the following testimony in support of his argument:

[From the first trial:]

Q:    Did you talk with the fire department to determine how much of the house they tore up, and how much was like that already, and how much the fire might have done[?]  Can you just tell from looking at it what the fire department tore out?

A:    I did not talk to any firefighters that actually suppressed the fire.  Again, they weren't there at the scene and I was just there to determine the cause and origin of the fire.  If they're normally there, yes, we would interview them, again, how they attacked the fire and so forth.

Q:    So you didn't ask anybody specifically, did you kick this or .

A:    No, sir.

Q:    . . . did that spread get pushed up there by the fire department or was that where it was all the time?

A:    I did not interview the firefighters in reference to that.

[From the second trial:]

Q:    During the course of your coming to a conclusion, or opinion, in this situation, did you attempt to interview any of the firemen that [sic] were there?

A:    I did interview the firemen.  I was particularly concerned about the latch system on the door where Ms. Lance was found behind.

Q:    Do you remember who you spoke to?

---

[6] By the time of the defendant's second trial, James Cooper had retired as an ATF special agent.

A:      I talked to the captain. Basically – I made observations that if the door was locked that door wouldn't be standing there. In other words, they would have taken that door down with a fire ax. They already know [sic] that we have Ms. Lance back there somewhere in the house. They are going in there to do a rescue. So, they know there is a human being back there, so they've got to get there. Time is crucial. But, if it was locked the door would have been taken off.

I talked to Captain Jenkins. . . .

[Later in Mr. Cooper's testimony, the following colloquy transpired:]

Q:      So what is your understanding of the position of that when Ms. Lance was found? Was it latched or unlatched?

A:      Again, talking to Captain Jenkins, it was latched. He had to use two hands to unlatch –

The defendant posits that these testimonies reveal that Mr. Cooper testified falsely when he reported that he interviewed Captain Jenkins and that the state sponsored what it knew or should have known was false testimony. The state counters that the two testimonies do not conflict because in the first trial, Mr. Cooper testified that he did not interview any firefighters who suppressed the fire and may have damaged the house, whereas in the second trial, Mr. Cooper testified that he interviewed Captain Jenkins regarding whether the utility room door was latched. Captain Jenkins's role at the fire was to locate the victim, rather than extinguish the fire. Accordingly, the state argues that the two testimonies are consistent. We conclude that when viewed as a whole, the trial transcripts do not conclusively demonstrate that Mr. Cooper testified falsely at the second trial. Accordingly, we conclude that the defendant has not demonstrated that the state knowingly introduced false testimony by introducing Mr. Cooper's testimony.

C.  David Miller

Finally, the defendant argues that Detective David Miller testified falsely at the second trial, as revealed by the inconsistencies between his first and second trial testimonies. Specifically, the defendant notes that Detective Miller testified at the first trial that the kerosene-soaked bedspread was "laying longways . . . in front of the utility room door," whereas at the second trial, Detective Miller testified that the bedspread draped from the edge of the refrigerator to the door between the kitchen and the living room, forming the basis for his conclusion that the arsonist's intent was to spread the fire from the fire's origin in the front room to the kitchen. The defendant further asserts that in the first trial, Detective Miller testified that he collected evidence under Mr. Cooper's direction and that this statement was supported by Detective Mike Roland's testimony that Detective Miller was "doing the actual collection of evidence" at the crime scene. The defendant

asserts that this testimony from the first trial contradicts Mr. Cooper's testimony at the second trial that he was collecting evidence, not Detective Miller. The defendant presents the following testimony of Mr. Cooper in support of his argument:

[From the second trial:]

Q: . . . you took a sample of kerosene from that jug and you put it into a little vial?

A: A vial. Yes, sir.

Q: How did you do that?

A: Very carefully, without spilling on the bedspread.

Q: That vial is about that big, isn't it?

A: Yes, sir. Again, I was able to put some in the vial.

Q: How?

A: I didn't pick the jug up and pour it in. No, sir. Again, I don't know – I am trying to remember. Did I open the mouth and stick it – I don't remember.

Q: It is melted shut. You couldn't get the lid open.

A: I am testifying, sir, I don't remember. But I was very careful. I do remember I took a sample out of that five gallon plastic container[] containing kerosene and put it in a vial. I do remember that, sir. And I was very conscious of not spilling it on the bedspread.

Q: And how did you collect the bedspread sample? Did you use a pair of scissors? Did you use a knife? How did you get that?

A: I had a knife . . . .

. . . .

-18-

Q:      . . . You have already been shown that sample of debris that
        you took out of the living room, that you said you took from
        the baseboard?

A:      Yes, sir.

Q:      And you took a piece of the baseboard?

A:      Some of the baseboard.  Yes, sir.

Q:      And you took other debris – where did the rest of the debris
        come from?  That whole can is full of debris.  Where did that
        other stuff come from?

A:      Sir, I took that – that was up against the baseboard. I did not
        want to disturb the baseboard where the V-pattern, was, the
        small V-pattern, then you have that wide V-pattern on the
        baseboard.

Q:      Uh-huh.

A:      I went ahead and collected what was against the baseboard,
        put it in the can, then, I took some of the baseboard myself
        and put it in the can.

The defendant asserts that this testimony demonstrates an inconsistency between the first and second trial testimonies, specifically a discrepancy about who collected evidence at the crime scene, Detective Miller or Mr. Cooper.

In regard to the defendant's assertion that Detective Miller testified falsely at the second trial about the placement of the kerosene-soaked bedspread, the state responds that Detective Miller testified at both trials that the bedspread was located in front of the refrigerator and that he never contradicted himself on this point.  Regarding the defendant's assertion that Detective Miller perjured himself by testifying at the second trial that Mr. Cooper collected the evidence at the crime scene whereas he testified at the first trial that he collected the evidence himself, the state argues that the two testimonies are consistent because Detective Miller clarified at the second trial that Mr. Cooper actually collected the evidence and that he assisted Mr. Cooper in his collection procedures. Furthermore, the state argues that any discrepancy in the testimonies can be attributed to the effect that the eleven-year passage of time may have had on Detective Miller's memory of the evidence collection.

We conclude that the defendant has not demonstrated that the state knowingly presented false testimony by offering Mr. Cooper's testimony at the second trial that he collected

evidence at the crime scene. The testimony presented by the defendant in support of his argument does not definitively demonstrate the falsity of Mr. Cooper's testimony, and we hold that any discrepancy between the two testimonies is not indicative of perjury but rather may be attributed to an inaccurate recollection eroded by the significant passage of time between the crime and the instant trial. *See, e.g., State v. Charles E. Robinson*, No. M2004-01163-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Nashville, Aug. 17, 2005) (holding that the defendant failed to demonstrate that the state knowingly presented false, as opposed to inaccurate, testimony and noting that "[t]he presentation of inaccurate testimony by a state's witness does not equate to a showing that the state knowingly sponsored false testimony").

### III. Admission of Expert Testimony

The defendant complains that the trial court erroneously allowed Mr. Cooper to offer expert testimony regarding the "pour pattern" of accellerants that he deduced by examining the defendant's house. Specifically, the defendant argues that the trial court should have required Mr. Cooper to demonstrate a scientifically reasonable standard for his conclusion that the fire was a result of arson and, specifically, that a "pour pattern" existed on his front room floor prior to being allowed to testify before the jury. The defendant asserts that the trial court did not conduct the requisite review to determine the trustworthiness of Mr. Cooper's method of discerning pour patterns and that Mr. Cooper offered no scientific evidence in support of his conclusions that a pour pattern existed. The state counters that the trial court properly admitted Mr. Cooper as an expert witness based on his extensive training and experience in fire cause and origin investigation and that Mr. Cooper offered sufficient evidence to support his conclusion of the existence of a pour pattern in the defendant's front room floor.

All evidence, including expert testimony, must be relevant. Tenn. R. Evid. 402. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence may be excluded if its probative value is "substantially outweighed" by the danger of unfair prejudice. Tenn. R. Evid. 403.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Its counterpart, Rule 703, focuses on the reliability of expert opinion testimony:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).

As emphasized by the defendant, the trial court had a duty to review the basis for Mr. Cooper's opinion and determine its trustworthiness. The trial court must "determine whether the reasoning or methodology underlying the scientific evidence is sufficiently valid and reliable, and whether it can properly be applied to the facts at issue." *McDaniel*, 955 S.W.2d at 258. The court must be satisfied that the expert "opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Id.* at 265.

The record does not reveal that the trial court abused its discretion in accepting Mr. Cooper as an expert and allowing him to offer his conclusions regarding the presence of a pour pattern in the front room of the defendant's house. The defendant argues that Mr. Cooper's testimony failed to establish a reliable scientific basis for his opinion that a pour pattern existed on the floor of the front room in the defendant's house. However, when viewing Mr. Cooper's testimony as a whole, we find that the court had a sufficient basis for allowing Mr. Cooper's testimony and accordingly did not abuse its discretion by admitting it. Mr. Cooper testified that he had been extensively trained in fire investigation, had investigated between 150 and 200 fires, and had instructed others in fire investigation. Mr. Cooper based his conclusion on his observation that the front room had suffered fire damage, whereas the other rooms in the house had only suffered smoke and heat damage. Moreover, Mr. Cooper determined the existence of a pour pattern in the front room based upon his experience of examining numerous fire scenes. He opined that radiant heat damage is often mistaken for a pour pattern by less experienced fire investigators but that his extensive experience allowed him to make that distinction and definitively identify the existence of a pour pattern in the defendant's front room. At trial, Mr. Cooper elaborated that he examined the baseboards in the defendant's front room because an accellerant will usually run under a baseboard. Under one baseboard he discovered a "V pattern," which is caused by an accellerated fire. Mr. Cooper testified that these individual conclusions formed the basis for his opinion that the defendant's house fire had been deliberately set.

As noted earlier in this opinion, defense counsel subjected Mr. Cooper to a rigorous cross-examination, in which he elicited, *inter alia*, that Mr. Cooper did not interview many of the

witnesses personally despite his assertion that witness observations played a crucial role in his analysis of a fire scene, that Mr. Cooper did not observe the defendant's house before the booster-hose cleaning, and that he did not see the front furniture in its pre-fire position. During cross-examination, Mr. Cooper conceded that a pour pattern could be mimicked by a polyester meltdown, although Mr. Cooper insisted that he could distinguish between the two. Moreover, the defendant presented the testimony of his own expert, Stewart Bayne, who testified that the fire was accidental, unaided by accellerants.

Thus, we conclude that there was a sufficient indicia of reliability to support the trial court's decision to allow Mr. Cooper's expert testimony and that defense counsel's artful cross-examination of Mr. Cooper coupled with the defendant's presentation of a competing version of the fire's cause through the testimony of his own expert witness gave the jury ample opportunity to reject Mr. Cooper's testimony.

## *IV. Jury Instructions*

The next issue that the defendant raises on appeal presents a compendium of complaints about the jury instructions that were and were not given at his trial. Before addressing these complaints, we begin with a brief overview of this case.

The offense for which the defendant stands convicted occurred in 1992. At that time, first degree felony murder was defined as a "reckless killing of another committed in the perpetration of, or attempt to perpetrate" an enumerated felony. Tenn. Code Ann. § 39-13-202(a)(2) (1991). The defendant first stood trial in 1993, at which time the test for determining whether an offense is necessarily included in another offense was controlled by *Howard v. State*, 578 S.W.2d 83 (Tenn. 1979).

Subsequently, the defendant's conviction was vacated in 2001 by this court on appeal from the denial of post-conviction relief. *See Claude Francis Garrett v. State*, No. M1999-00786-CCA-R3-PC (Tenn. Crim. App., Nashville, Mar. 22, 2001). The defendant was then retried in 2003, at which time the test for determining whether an offense is necessarily included in another offense was controlled by *State v. Ely*, 48 S.W.3d 710 (Tenn. 2001), and *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999).[7]

---

[7] Pursuant to *Burns*, an offense is lesser-included if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or

> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

> (1) a different mental state indicating a lesser kind of culpability; and/or

(continued...)

-22-

The trial court, at the defendant's second trial, instructed the jury on first degree "reckless" felony murder and included instructions on second degree murder and criminally negligent homicide as lesser included offenses.

A.  Instruction on Second Degree Murder

The defendant complains that it was prejudicial error for the trial court to charge the jury on second degree murder because second degree murder was not a lesser included offense of felony murder, as it existed in 1992 at the time of the homicide in this case. The state agrees that the charge should not have been given but insists that the error was harmless.

Prior to the filing of *Burns* in 1999, the law was settled that second degree murder, a "knowing" killing, was not a lesser included offense of "reckless" felony murder. As the court explained in *State v. Gilliam*, 901 S.W.2d 385 (Tenn. Crim. App. 1995),

> "Reckless" is a lesser included mental state of "knowing". *See* Tenn. Code Ann. § 39-11-301(a)(2) (1991).  When acting recklessly establishes an element, that element is also established if the defendant acted knowingly. *Id.*  Conversely, when acting knowingly establishes an element, that element is not established if the defendant acted only recklessly. *See Id.*  Therefore, in order to find a defendant guilty of second-degree murder, an element not contained in first-degree felony murder (the mental element of "knowing") must be established.  It follows that, under *Howard*, second-degree murder is not a lesser included offense of first-degree felony murder.  The only lesser included offenses of first-degree felony murder are reckless homicide,  Tenn. Code Ann. § 39-13-215 [ ], and criminally negligent homicide, Tenn. Code Ann. § 39-13-212 (1991).

---

[7](...continued)

> (2) a less serious harm or risk of harm to the same person, property or public interest; or

> (c) it consists of

> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

> (2) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

6 S.W.3d at 466-67.

901 S.W.2d at 390-91 (footnotes omitted). The same result has been reached when analyzed according to *Burns*. *See State v. Ben Mills*, No. W1999-01175-CCA-R3-CD (Tenn. Crim. App., Jackson, May 3, 2002) (applying *Burns* to a "pipeline" case and concluding "second degree murder, which required a showing of the 'knowing' mental state, would not have been a lesser included offense of felony murder as it existed in 1995"). A contrary result, however, appears most recently in *William Glenn Wiley v. State,* No. M2003-00661-CCA R3-PC (Tenn. Crim. App., Nashville, Sept. 23, 2004), *perm. app. granted* (Tenn. Feb. 28, 2005*)*. The court in that case applied *Burns* retroactively in a post-conviction case when the defendant's notice of appeal from his original judgment was filed the same day that *Burns* was decided, and the court concluded:

> Based upon *Burns*, we conclude second degree murder would be a lesser-included offense of "reckless" felony murder as that offense was defined prior to July 1, 1995, just as it is under felony murder as it is defined for offenses committed on or after July 1, 1995. *See Ely*, 48 S.W.3d at 721-22. In *Ely*, second degree murder was found to be a lesser-included offense of felony murder under the current statute based upon part (b) of *Burns*. *Id*. The additional *mens rea* of recklessness in the prior statute would not eliminate second degree murder as a lesser-included offense of felony murder under the rationale of *Ely*.

*William Glenn Wiley*, slip op. at 10. Notably, then, in *William Glenn Wiley*, this court applied *Burns* to a pre-July 1, 1995 homicide as a predicate for holding that the "reckless" form of first degree felony murder included the lesser offense of second degree murder. Applying this rule, the trial court in the present case did not err.

In the event, however, the law develops that second degree murder is not a lesser-included offense of "reckless" felony murder as that offense was defined prior to July 1, 1995, we are confident that the instructional inclusion of second degree murder in this case was harmless error. The jury did not convict the defendant of second degree murder, and the jury rejected both that offense and the charged lesser included offense of criminally negligent homicide.

Secondarily, the defendant is aggrieved of the charge given for second degree murder because the instruction misstated the correct *mens rea*. The trial court instructed the jury that to find the defendant guilty of second degree murder the state must have proven that the defendant unlawfully killed the alleged victim and "that the killing was done recklessly." We agree that the trial court misstated the law and substituted the proper mental element of "knowingly" with "recklessly." *See* Tenn. Code Ann. § 39-13-210(a)(1) (1991). Even so, the error, is harmless. The jury did not convict the defendant of second degree murder, and we are at a loss to glean how such error would have worked to the defendant's detriment.

B. Reckless Homicide

The defendant complains that the trial court failed to give an instruction for reckless homicide as a lesser included offense of felony murder. This complaint need not detain us long. Reckless homicide did not exist as a statutory offense in 1992, when the defendant performed the acts leading to his indictment. Reckless homicide, codified at Tennessee Code Annotated section 39-13-215, was enacted in 1993. See 1993 Tenn. Pub. Acts, ch. 306 § 2, at 482-83. Therefore, the trial court committed no error by failing to charge reckless homicide as a lesser included offense.

Regarding reckless homicide, we note that both the defendant and the state mistakenly relied upon the following passage in *Gilliam*: "The only lesser included offenses of first-degree felony murder are reckless homicide, Tenn. Code Ann. § 39-13-215 (1991), and criminally negligent homicide, Tenn. Code Ann. § 39-13-212 (1991)." *Gilliam*, 901 S.W.2d at 391. That statement is incorrect inasmuch as 1991 Replacement Volume 7 did not contain code section 39-13-215; rather, it first appeared in the 1994 pocket-part Supplement to 1991 Replacement Volume 7. However, in footnote 6, the *Gilliam* court did correctly observe that the defendant "cannot be convicted of reckless homicide because the statute became effective on May 12, 1993, after the commission of the instant offense." *Id*. at 391 n.6.

C. Definitions of Intentionally, Knowingly, and Recklessly

The defendant next assails the trial court's instructional definitions of intentionally, knowingly, and recklessly. To place his arguments in perspective, we begin by reviewing the jury charge given in this case. Before providing the jury with instructions on the charged offense of felony murder, the trial court gave the following preliminary definitions of the terms "recklessly," "knowingly," and "criminally negligent":

> Definitions of terms used in this charge.
>
> Recklessly means that a person acts recklessly when the person is aware of but consciously disregards a substantial and unjustifiable risk that the alleged victim will be killed. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.
>
> The requirement for recklessly is also established if it [is] shown that the Defendant acted intentionally or knowingly.
>
> Intentionally means that a person acts intentionally when it is the person's conscious objective or desire to cause death of the alleged victim.

Knowingly means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim.

The requirement of knowingly is also established if it is shown that the Defendant acted intentionally.

Criminally negligent means that a person acts with criminal negligence when the person ought to be aware of a substantial and unjustifiable risk that the alleged victim will be killed. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

The requirement for criminal negligence is also established if it is shown that the Defendant acted intentionally, knowingly or recklessly.

The trial court then proceeded to instruct the jury on the charged offense of felony murder.

I shall now proceed to explain to you what in law it takes to constitute the offense of first degree murder as charged in the indictment in this case.

First degree murder. Any person who commits first degree murder is guilty of a crime.

For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

One, that the Defendant unlawfully killed the alleged victim; and

Two, that the killing was committed in the perpetration of or the attempt to perpetrate the alleged arson. That is, that the killing was closely connected to the alleged arson and was not a separate, distinct and independent event; and

-26-

Three, that the Defendant intended to commit the alleged arson; and

Four, that the Defendant acted intentionally. Excuse me, acted recklessly.

The trial court at that point restated the definitions of recklessly, intentionally, and knowingly given earlier, and it concluded with the following instruction regarding arson:

To establish that the Defendant committed the underlying offense of arson, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

One, that the Defendant, by means of fire or explosion, damage[d any structure], and

Two, that the Defendant did so with the intent to destroy or damage the structure for any unlawful purpose, and

Three, that the Defendant acted knowingly.

The intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim.

The defendant acknowledges that the trial court's instructions comport with *State v. Page*, 81 S.W.3d 781, 790-92 (Tenn. Crim. App. 2002) (concluding that first degree premeditated murder, a knowing second degree murder, voluntary manslaughter, reckless homicide and criminally negligent homicide are "result-of-conduct offenses"; Appendix of a proper jury charge included). He, nevertheless, insists that the *Page* instructions apply only to offenses committed on or after July 1, 1995; therefore, he maintains, the instructions are erroneous. We disagree.

The statutory definitions of relevant culpable mental states appear in Code section 39-11-302. These definitions have not changed since their enactment as part of the comprehensive 1989 revision of Tennessee's Criminal Code. *See* Tenn. Code Ann. § 39-11-302(a) - (d) (1991 & 2003). The trial court in this case obviously patterned its instructions relative to culpable mental states after the example set forth in *Page*, for which we find no error. Admittedly the suggested jury instructions set forth in *Page* are stated to apply to "First Degree Murder (Premeditated Killing) (For Offenses Committed on or after July 1, 1995)." 81 S.W.3d at 790. The defendant, however, was not charged with premeditated first degree murder; his indicted offense was first degree felony murder, and even though both premeditated first degree murder and felony murder were revised effective July 1, 1995, *Page* focused on the proper *mens rea* and its *applicable conduct elements* for

criminal offenses. The statutory definitions of relevant culpable mental states did not change in 1995.

The defendant also maintains, without any supporting authority, that the trial court should not have instructed the jury that the requirement of "knowingly" is established if shown that the defendant acted "intentionally" and that the requirement of "recklessly" is established if shown that the defendant acted "intentionally" or "knowingly." Those instructions, however, were approved in *Page* and find direct support in Code section 39-11-301(a)(2), which provides in relevant part:

> (2) When the law provides that . . . recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly. When acting knowingly suffices to establish to an element, that element is also established if a person acts intentionally.

Tenn. Code Ann. § 39-11-301(a)(2) (1991 & 2003). The defendant's argument must fail.

In a related argument, the defendant furthermore insists that via the instruction given for "intentionally," the trial court "constructively amended" the indictment to charge him with premeditated murder when, in fact, he was charged with a reckless homicide perpetrated during the commission of arson. This argument is unavailing. Evidently the defendant is under the erroneous impression that *only* a reckless homicide will suffice to prove felony murder. However, a conviction may be obtained even though the proof shows that the killing was intended. *See State v. Frank Whitmore*, No. 03C01-9404-CR-00141, slip op. at 13 (Tenn. Crim. App., Knoxville, June 19, 1997).

Yet another complaint that the defendant registers is that the trial court provided the jury with an erroneous and misleading instruction and definition of the *mens rea* elements of first degree "reckless" felony murder and the underlying felony of arson. In terms of the *mens rea* element of recklessly, the defendant again claims that the instructional language taken from the *Page* decision is inadequate, and we again reject that contention.

Although the defendant's argument regarding the *mens rea* element of arson is not entirely clear, we glean that it focuses on the conduct element tied to the mental state required to prove arson. As relevant to this case, an individual commits the offense of arson "who knowingly damages any structure by means of a fire or explosion . . . [w]ith intent to destroy or damage any structure . . . for any unlawful purpose." Tenn. Code Ann. § 39-14-301(a)(2) (1991 & 2003). The offense requires an act to be done "knowingly," which can refer to all three conduct elements: (1) nature of conduct, (2) circumstances surrounding conduct, and (3) result of conduct. *See id.* § 39-11-302(b) ("'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct

-28-

when the person is aware that the conduct is reasonably certain to cause the result."); *Page*, 81 S.W.3d at 787.

In *State v. Gene Shelton Rucker, Jr.*, No. E2002-02101-CCA-R3-CD (Tenn. Crim. App., Knoxville, Dec. 9, 2004), *perm. app. denied* (Tenn. 2005), this court considered whether aggravated arson is a result-of-conduct offense. Relying on the supreme court's description of result-of-conduct offenses in *State v. Ducker*, 27 S.W.3d 889, 895-96 (Tenn. 2000), we reasoned,

> Under our arson statutes, a person commits aggravated arson "who commits arson" under additional, specified circumstances necessary to elevate the arson into aggravated arson. Tenn. Code Ann. § 39-14-302(a)(1), (2) (2003). Simple arson is defined in terms of a person "who *knowingly* damages any structure by means of a fire or explosion." *Id.* § 39-14-301(a) (2003) (emphasis added). Grammatically speaking, the word "knowingly" modifies "damages," which refers to the result of the person's conduct. Nonetheless, the arson statute does not focus purely on the result – that is, damage to a structure. Instead, the nature of the conduct – creating a fire or explosion – that causes the damage to the structure is consequential and central to the offense. Measured according to the parameters set forth in *Ducker*, arson and aggravated arson, therefore, are not result-of-conduct offenses; they do not require that a defendant act with an awareness that setting a fire or creating an explosion is reasonably certain to cause damage to a structure.

*Gene Shelton Rucker, Jr.*, slip op. at 12.

The trial court in the instant case did not define the *mens rea* element of arson in terms of nature of the defendant's conduct. The court's charge in this case defined "knowingly" only with reference to the result of the defendant's conduct; that is, "act[ing] with an awareness that his conduct is reasonably certain to cause the death of the alleged victim." Consequently, in our opinion, the jury was incorrectly instructed on the "knowing" element of arson. The question then becomes whether the instructional error was harmless.

"The misstatement of an element in jury instructions is subject to constitutional harmless error analysis." *State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005) (citing *Pope v. Illinois*, 481 U.S. 497, 501-03, 107 S. Ct. 1918 (1987)). Likewise, "[t]he failure to instruct the jury on a material element of an offense is a constitutional error subject to harmless error analysis." *Id.* Regardless whether the error in this case is classified as a misstatement or an omission of an element, the error qualifies as constitutional in nature. That said, in our view the instructional error was harmless beyond a reasonable doubt.

By defining the *mens rea* element of arson solely in terms of result-of-conduct, the trial court did not lessen the state's burden of proof. On the contrary, the instruction increased the state's burden by requiring proof beyond a reasonable doubt that the defendant was aware that his conduct was reasonably certain to cause death. *See id.* at 59 (inclusion of "superfluous language in the 'knowingly' definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly"). Furthermore, the essence of the defense theory was that the fire ignited accidently and was not fueled by a chemical accellerator. Thus, causation and not the defendant's *mens rea* was the central issue. *See Page*, 81 S.W.3d at 789 (suggesting an erroneous *mens rea* instruction would likely be harmless when identity, not *mens rea*, was the disputed issue at trial).

The defendant's final *mens rea* instructional error is that the jury was permitted to presume that the death of the alleged victim supplied the intentional and knowing elements of the underlying arson. However, we are satisfied this did not occur. The trial court was careful to instruct the jury that the intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim.

### D. Unlawful Purpose

According to the defendant, it was prejudicial error for the trial court to fail to define the "unlawful purpose" element of the underlying offense of arson. We are not aware of any such instructional requirement, and the defendant certainly cites no authority for this argument; nor does he indicate how the term should have been defined other than suggesting that an unlawful purpose "denotes an intended result of a violation of further [sic] statute or ordinance." Inasmuch as the state's theory was that the defendant set fire to the residence to kill the victim who was locked or trapped in the laundry room, we believe it self-evident that the defendant's purpose was "unlawful."

### E. Expert Witness Instruction

The defendant assails the trial court's expert-witness instruction given in this case. The trial court charged the jury in part,

> The rules of evidence provide that if scientific, technical or other specialized knowledge *might assist* the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by reason of special knowledge, skill or experience may testify and state his opinions concerning such matters and give reasons for his testimony.

(Emphasis added).

Because Tennessee Rule of Evidence 702 speaks of an expert testifying if scientific, technical, or other specialized knowledge will "substantially assist" the trier of fact, Tenn. R. Evid.

702, the defendant proposes that the trial court erroneously instructed and invited the jury to consider Agent Cooper's testimony by a lower standard of scrutiny – "might assist."

Our review of the record shows that the defendant filed an original motion for new trial and five subsequent amendments that added additional grounds seeking a new trial. The trial court's expert-witness instruction is not among the cited grounds. This issue accordingly has been waived. *See* Tenn. R. App. P. 3(e) ("in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties, or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial"); 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Even if not waived, the issue affords the defendant no relief. Evidence Rule 702 addresses the *admissibility* of expert testimony and the trial court's role in considering whether such testimony may be presented to the jury. The rule does not instruct the jury how to consider the expert testimony, and the trial court was careful in this case to advise the jury:

> Merely because an expert witness has expressed an opinion does not mean, however, that you are bound to accept this opinion. The same as with any other witness, it is up to you to decide whether you believe this testimony and choose to rely upon it.

### V. Confrontation and Compulsory Process Issues

A. Cross-examination of David Miller

The defendant claims that the trial court denied him the constitutional right to confront adversary witnesses when David Miller "refused to answer questions propounded to him by the defense." The defendant refers to Mr. Miller's responses to three questions asked during cross-examination. To a question about how Agent Cooper collected a piece of the bedspread, Mr. Miller responded, "I would prefer that to be Mr. Cooper's answer, sir." When asked about Agent Cooper's collection of liquid from a jug of kerosene, Mr. Miller responded, "You'll have to ask Mr. Cooper, sir." Finally, Mr. Miller said, "You will have to ask Special Agent Cooper" when asked about Agent Cooper's collection of evidence from under a baseboard. The defendant ascribes to the witness and the prosecution sinister motives in responding in the above fashion, based upon the defendant's claim that, in the first trial, Mr. Miller testified that *he* collected the three samples of evidence.

The state counters that the defendant has waived appellate review of the issue because the defendant failed to object to the witness' claimed evasion and failed to seek contemporaneous redress from the trial court. We agree.

One can infer from Mr. Miller's responses cited by the defendant that the witness' knowledge on the subjects presented was inadequate for informative answers. In our view, the defendant's belief that the responses were in conflict with prior testimony was subject to exploration via cross-examination. *See* Tenn. R. Evid. 613. His claim that the responses were evasive likewise could have been explored by cross-examination, but if the defendant wishes to claim on appeal that the witness' evasion equated to a denial of his right of confrontation, we think more was required than to merely allow the witness to evade. *See Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 294 (1985) ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, [but] not cross-examination that is effective in whatever way . . . .") (emphasis in original).

The defendant should have established that the claimed evasion was tantamount to a denial of the right of confrontation by objecting and seeking the court's aid in compelling the witness to respond. *See* Tenn. R. Crim. P. 17(a) (providing that subpoena power embraces power to command witness to "give testimony"); *id.* 17(g) ("Refusal by any person without adequate excuse to obey a subpoena . . . may be deemed a contempt of the court . . . ."); Tenn. R. Evid. 611 (empowers trial court to "exercise appropriate control over the presentation of evidence and conduct of the trial"). In the absence of a challenge to the witness' responses, we cannot discern whether the responses were merely grounded in lack of knowledge or were evasive to the point of denying the defendant the opportunity for effective cross-examination. More importantly, the failure to challenge the responses by objection or by a request that the trial court employ its contempt power to compel a response precluded the opportunity of the trial court as an observer of the witness' demeanor to pass on the issue. *See* Tenn. R. App. P. 36(a) ("[R]elief may not be granted [on appeal] in contravention of the province of the trier of fact."). Accordingly, in the case presented to us, we hold that the defendant waived the issue of whether Mr. Miller's evasiveness denied the defendant his right of confrontation.

### *VI. Witness Expense for Testimony at Hearing on Motion for New Trial*

In a related issue, the defendant requested the trial court to approve an expense disbursement to cover the cost of David Miller traveling to Davidson County from Florida to testify in the hearing on the motion new trial. The defendant now claims in a supplemental brief that the trial court's denial of this request was error.[8] In his brief, the defendant argues that David Miller's testimony in the motion for new trial hearing was necessary and material because, in the hearing, Mr. Miller "would have been compelled to answer the question under oath as to how [the] evidence [taken from the floor near the baseboard] was collected." The defendant asserted in his brief that Mr. Miller testified in the first trial that he collected this material sample, that Cooper testified in the second trial that Cooper had collected the sample, and that in the hearing on the motion for new trial, Mr. Miller "should have been compelled to answer questions under cross-examination as to who was telling the truth and who was committing perjury." The defendant argues that the denial of the witness-expense funding was a denial of due process of law.

---

[8]This issue was raised in the trial court via the defendant's fifth amendment to his motion for new trial.

-32-

The trial court, however, denied the motion on the grounds that (1) Mr. Miller's presence in the motion for new trial hearing was unnecessary, (2) the defense did not seek to compel Mr. Miller's responses during his trial testimony, and (3) the trial court had no statutory authority to approve funding for the attendance of an out-of-state witness at a hearing on a motion for new trial. Predictably, the state posits that the trial court was correct as to any and all of its bases for denying the motion.

First, we dispose of the constitutional basis for citing as error the denial of the funding motion. The defendant cited to this court no authority for the proposition that the denial of the motion deprived him of due process of law. Tennessee Court of Criminal Appeals Rule 10(b) mandates that, in this situation, the issue "will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b).

Second, the defendant has offered no argument based upon statute, rule, or caselaw that the trial court erred in denying the motion. Therefore, his claim is waived pursuant to Rule 10(b), as well. At any rate, Tennessee Rule of Criminal Procedure 17(b) provides:

> The court shall order at any time that a subpoena be issued for service on a named witness upon an ex parte application of a defendant upon *a satisfactory showing* that the defendant is financially unable to pay the fees of the witness and *that the presence of the witness is necessary to an adequate defense*.

Tenn. R. Crim. P. 17(b) (emphases added). The trial court recited as one of its bases for denying the motion that the defendant had not shown that Mr. Miller's testimony was necessary. As an aside, we agree with the trial court that the significance of Mr. Miller's proposed testimony is counter-indicated by the defendant's failure to elicit further testimony from Mr. Miller when it had him on the witness stand at trial. The bottom line is, however, that the defendant has made no showing that the trial court abused its discretion in disallowing funds to facilitate Mr. Miller's testimony in the hearing *See* Tenn. R. Crim. P. 33(c) (stating that the trial court "may *in its discretion* allow testimony in open court on issues raised in the motion for new trial") (emphasis added).

### VII. Brady Violation

The defendant argues that the state withheld an exculpatory statement in which Captain Jenkins informed Mr. Cooper that the utility room door in the defendant's home was latched, not locked, and that the withholding of this information is reversible error pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). The state counters that the statement is neither exculpatory nor material and therefore not a *Brady* violation.

In *Brady*, the United States Supreme Court held that the prosecution has a constitutional duty to furnish an accused with exculpatory evidence pertaining to either the accused's guilt or innocence and the punishment that may be imposed. Failure to reveal exculpatory evidence

violates due process when the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution. *Id.* at 87, 83 S. Ct. at 1196-97. In *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936 (1999), the Court enumerated three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281-82, 119 S. Ct. at 1948.

In *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375 (1985), the Supreme Court explained that constitutional error results in the withholding of "material" evidence, and materiality exists when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S. Ct. at 3383.

The "materiality" of suppressed, favorable evidence was discussed at length in *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995), and *Johnson v. State*, 38 S.W.3d 52 (Tenn. 2001). Four aspects are highlighted in those cases. First, materiality does not demand a showing by a preponderance that the suppressed evidence would have resulted in the defendant's acquittal. *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566; *Johnson*, 38 S.W.3d at 58. Second, materiality is not an evidence-sufficiency test. *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566; *Johnson*, 38 S.W.3d at 58. Third, once constitutional error has been found, there is no need for further harmless error review. *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566; *Johnson*, 38 S.W.3d at 63. Last, the "suppressed evidence [is to be] considered collectively, not item by item" to gauge materiality. *Kyles*, 514 U.S. at 436, 115 S. Ct. at 1567. Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S. Ct. at 1566; *see Johnson*, 38 S.W.3d at 58.

The defendant contends that the state should have informed him that Mr. Cooper would testify that after investigating the crime scene, Captain Jenkins informed him that the utility room door was latched, not locked. While testifying, Mr. Cooper explained that Captain Jenkins concluded that if the utility room door had been locked during the fire, the firefighters searching for the victim would have used a fire axe to break the door down, which they did not do. Captain Jenkins reported that when he inspected the door, it was latched, requiring him to use both hands to unlatch it. As noted earlier in this opinion, this court reversed the defendant's first degree murder conviction after his first trial because the state had withheld Detective Miller's report indicating that the utility room door was not locked. *See Claude Francis Garrett v. State*, No. M1999-00786-CCA-R3-PC, slip op. at 15-20 (Tenn. Crim. App., Nashville, Mar. 22, 2001). This court reasoned that the information was exculpatory and material because it negated the state's theory that the defendant had purposefully locked the victim in the utility room and then set the house on fire. *See id.* Conversely, the information relayed to Mr. Cooper does not negate a theory that the defendant deliberately confined the victim in the utility room; rather, it clarifies how the victim was confined. Accordingly, we do not find that the state's failure to share this information with the defendant is a violation of the defendant's due process rights pursuant to *Brady*.

## VIII. State Misconduct

The defendant argues that the state engaged in prosecutorial misconduct when it elicited false testimony from Bobby Alcorn and James Cooper, that this false testimony prejudiced him, and that accordingly he is entitled to a new trial. However, earlier in this opinion we addressed the defendant's claim that these witnesses testified falsely during his second trial, and we determined that the defendant had not demonstrated that any claimed contradictions in these testimonies are attributable to perjury. Accordingly, we similarly conclude that the defendant has not demonstrated that the presentation of these testimonies was prosecutorial misconduct.

In related issues alleging state misconduct, the defendant advances two issues for the first time on appeal, specifically that he was denied his presumption of innocense by references to his first trial during his second trial, including one reference by the prosecutor during closing arguments, and that the state advanced inconsistent facts and theories during the two trials of this case, thereby violating his due process rights. However, an appellate issue may not be predicated upon an alleged error at trial unless that issue was also presented by the defendant in his or her motion for new trial. *See* Tenn. R. App. P. 3(e). Accordingly, the defendant has waived these issues for consideration on appeal, and we are unpersuaded – and the defendant does not argue – that either issue constitutes plain error necessitating our review.

## IX. Conclusion

We have discerned no reversible error in the trial court's proceedings and, accordingly, we affirm the court's judgment.

_____
JAMES CURWOOD WITT, JR., JUDGE